## UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| David J. Jacobs, | ) | Case No. 07 B 13733 |
| | ) | |
| Debtor. | ) | |
| Juan Zamora, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 07 A 00959 |
| | ) | |
| David J. Jacobs, | ) | |
| | ) | |
| Defendant. | ) | Hon. Susan Pierson Sonderby |

## MEMORANDUM OPINION

This matter comes before the court on the motion filed by the debtor defendant, David J. Jacobs ("Jacobs") for an order dismissing the second amended complaint filed by the creditor plaintiff, Juan Zamora ("Zamora"). For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part. The section 523(a)(2), (a)(4), and (a)(6) claims withstand dismissal. The section 727(a) claim will be dismissed.

### Jurisdiction and Venue

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The proceeding concerns a determination of the dischargeability of a particular debt and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is properly placed in this court pursuant to 28 U.S.C. § 1409(a).

**Procedural Background**

Zamora was an employee of Northwestern Plating Works, Inc. ("Northwestern Plating"), an Illinois corporation, and a participant in the company's profit-sharing plan. Jacobs was Northwestern Plating's sole shareholder and president.

Prior to Jacobs's bankruptcy filing, Zamora filed a complaint in the Circuit Court of Cook County, Illinois against Jacobs to recover damages caused by, *inter alia*, Jacobs's alleged conversion of funds in the profit-sharing account. The judge presiding over that lawsuit entered a default judgment on January 4, 2006, in favor of Zamora and against Jacobs in the amount of $553,876 (comprising $278,876 in actual damages and $275,000 in punitive damages based on a finding of malice). The judgment was based "on fraud and [Jacobs's] conversion of money owed to Zamora." (Complaint, ¶ 5). After entry of the judgment, Jacobs testified under oath at a September 2006 examination pursuant to a Citation to Discover Assets commenced by Zamora (the "Citation Proceeding").

Jacobs filed a voluntary petition under chapter 7 of the Bankruptcy Code on July 31, 2007. The deadline for filing a complaint to determine dischargeability of debts under section 523(a)(2), (4), or (6) of the Bankruptcy Code was October 29, 2007. *See* Fed. R. Bank. P. 4007(c). That date was also the deadline to file a complaint objecting to discharge under section 727(a) of the Bankruptcy Code. *See* Fed. R. Bank. P. 4004(a). The deadline to file a complaint objecting to discharge was extended to September 11, 2008, at the request of and solely for the office of the United States Trustee. Zamora never asked for an extension of the deadline to file a complaint objecting to discharge.

On October 5, 2007, Zamora filed an adversary complaint, which was amended on October

-2-

11, 2007, alleging that the judgment debt Jacobs owed to him should be determined nondischargeable pursuant to 11 U.S.C. §523(a). The complaint was not separated into counts, and Zamora did not specify on which subsections of section 523(a) his claim was based. The parties' arguments, however, are premised on subsections (2)(A), (4) or (6) of section 523(a).

On March 25, 2008, an order was entered on Jacobs's motion dismissing Zamora's amended complaint with leave to amend. On April 7, 2008, Zamora filed a second amended complaint (the "Complaint"). Zamora included factual allegations absent from the two prior versions of the Complaint concerning Jacobs's purportedly false sworn testimony at the Citation Proceeding. Zamora also added the following paragraph:

> This debt [*i.e.*, the debt Jacobs owes Zamora] should also not be discharged pursuant to 11 U.S.C. § 727(a)(2) because Debtor lied under oath [at the Citation Proceeding] and willfully concealed assets from [Zamora] when he falsely denied that he [had] taken nearly one million dollars from the pension fund for his personal use and therefore willfully concealed what he had done with this money. This willful concealment effectively prevented [Zamora] from finding other assets Debtor may have had.

(Complaint, ¶ 20).

The paragraph is followed immediately by a prayer for relief asking that the "Court deny [Jacobs] a discharge with respect to creditor . . . Zamora." On October 6, 2008, an order was entered granting Jacobs a discharge under section 727. On that date, the extended deadline for the United States trustee to file a complaint objecting to discharge had passed and there was no timely-filed complaint objecting to discharge on file. There being no section 727 discharge objection complaint of record, a discharge order was entered. *See* Disch v. Rasmussen, 417 F.3d 769, 775 (7th Cir. 2005) (agreeing with the bankruptcy court that "it is permissible as a procedural matter for a court to grant a discharge when no complaint objecting to discharge has been filed at the expiration of the 60-day

period, notwithstanding a pending claim under § 523 seeking to exempt a particular debt from discharge.").

## The Motion to Dismiss

On May 15, 2008, Jacobs filed this motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in this proceeding pursuant to Fed.R.Bankr.P. 7012(b).[1]  He further contends that the Complaint fails to plead fraud with particularity as required by Rule 9(b). Finally, Jacobs contends that Zamora has brought an untimely claim for denial of discharge pursuant to § 727(a)(2) that does not relate back to the original complaint, and should therefore be dismissed.

## Sufficiency of the Complaint Under Rules 9 and 12(b)(6)

Well-pleaded allegations in the Complaint are assumed to be true for purposes of the motion to dismiss, all reasonable inferences being drawn in Zamora's favor. *See* Hecker v. Deere & Co., 556 F.3d 575, 580 (7th Cir.2009); Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 847 (7th Cir. 2008). Zamora was an hourly employee of Northwestern Plating. Jacobs was in full control of the day-to-day affairs of Northwestern Plating. Without prior notice to its employees, the company ceased operating on August 2, 2005.

## Allegations Concerning the Northwestern Plating Profit-Sharing Plan

Jacobs was the sole trustee of the profit-sharing plan established prior to 2000 for Northwestern Plating's participating employees, including Zamora. Jacobs "was responsible for ensuring that . . . profit sharing contributions were properly maintained and paid for..." and had "a

---

[1]

Hereinafter, all references to Rules are to the Federal Rules of Civil Procedure, which have been made applicable in this proceeding by various Federal Rules of Bankruptcy Procedure.

fiduciary duty to properly manage [the profit-sharing plan funds] for the benefit of Zamora and other

employees." (Complaint, ¶¶ 7, 16). Zamora alleges that the profit-sharing plan was subject to the

Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Northwestern Plating was obligated to and made regular contributions to the profit-sharing

plan account for Zamora, which were added to Zamora's voluntary contributions from portions of

his paychecks. Jacobs gave Zamora quarterly statements reporting Zamora's plan benefits,

comprising Zamora's voluntary contributions and the company's contributions.

Zamora's plan statement for the time period from April 1, 1999 to March 31, 2000, is

attached to the Second Amended Complaint and will be considered without converting this motion

to dismiss to a motion for summary judgment. *See* Hecker, 556 F.3d at 582 (*citing* Tierney v. Vahle,

304 F.3d 734, 738 (7th Cir. 2002)). The statement notes that it is prepared for Zamora and that he

is "100% vested in [his] Employer Contribution Account." (Complaint, Exhibit B). The statement

reports the beginning and ending balances of Zamora and Northwestern Plating's contributions in

the "Participant Accounts." After an accounting for  contributions, forfeitures, gains, losses,

transfers, and distributions, Zamora's total "vested account balance" as of March 31, 2000, is

reported as $240,209.70. (Id.). The statement notes that "100% of your Account balance will be

paid upon termination due to death, disability or retirement" and that "[y]ou will receive the vested

account balance shown on th[e] statement in the event of termination of employment for any other

reason." (Id.). Zamora does not provide a copy of the profit-sharing plan agreement or details about

the "Employer Contribution Account" or "Participant Accounts," which appear to refer to the same

account, *i.e.*, an account established pursuant to the profit-sharing plan into which contributions by

and on behalf of all participating Northwestern Plating employees were deposited and allocated on

the books to the individual employees.

In or about 2000, there was more than one million dollars in the profit-sharing plan account. Jacobs repeatedly made unauthorized, surreptitious withdrawals totaling approximately $940,000 from the plan account funds for his own personal use. Zamora does not relate when those withdrawals started and over what period of time they took place, but he does allege that when the withdrawals were made, Jacobs knew he had no right or interest in the plan account funds. Further, Zamora alleges that Jacobs "willfully converted money owed to Zamora . . . from [Zamora's] vested pension fund for [his] own personal benefit." (Complaint, ¶ 15).

Jacobs was indicted by the United States Attorney's Office for embezzling the plan account funds. Jacobs pleaded guilty to the criminal charges.

**Allegations Concerning Zamora's Paychecks**

On eleven occasions between February 24, 2005 and August 2, 2005, the date Northwestern Plating shut down, Jacobs issued paychecks to Zamora which were not honored due to insufficient funds. Jacobs, being aware of Northwestern Plating's bank account balances, knew that there were not enough funds to cover the checks when issued. Each time a paycheck was returned for insufficient funds, Jacobs promised Zamora that he would issue a new check to cover the dishonored check. Jacobs made the repeated promises of good replacement checks in order to induce Jacobs to continue working for Northwestern Plating, even though he did not truly intend to pay Zamora all the wages that were already earned or would become due. Jacobs alleges that Zamora's "willful actions were intended to deprive Zamora of payment of his wages and steal Zamora's time and services by not paying him the wages to which he was entitled." (Complaint, ¶ 12).

During the same five-month period preceding Northwestern Plating's shutdown, Jacobs

provided Zamora with an unspecified number of paychecks that did clear the bank. Zamora contends

that Jacobs gave him the token good checks in order to mislead Zamora into thinking that his salary

would be brought current if he continued working.

Zamora repeatedly approached Jacobs concerning the sporadic payment of his wages. To

make sure Zamora did not make good on his threats to quit if he was not paid in full, Jacobs

promised Zamora to give him information to access his vested benefits in the profit-sharing plan

account. Zamora relied on Jacobs's promises and continued working without being fully paid.

While continuing to work, Zamora waited for Jacobs to make good on his promise to give him

access to his vested profit-sharing plan benefits and was thus prevented from discovering that Jacobs

took the funds in the account. Zamora contends that this promise was false because at the time it

was made, Jacobs knew that he had already withdrawn most of the funds in the plan account for his

own personal use.

**Allegations Concerning Health Insurance Deductions**

Northwestern Plating provided Zamora with health insurance. Deductions were taken from

Zamora's paychecks for the express purpose of paying a portion of the insurance premiums. Without

notifying Zamora and the other employees, Jacobs cancelled the health insurance plan as of February

1, 2005; around the time the problems with the NSF paychecks started. Despite the cancellation of

the health insurance plan, Northwestern Plating continued to deduct money from Zamora's

paychecks (the ones that cleared) over the next five months until the company shutdown. The

deductions were taken from Zamora's paychecks ostensibly to cover the employee share of Zamora's

insurance premiums. Instead of paying the premiums, however, Jacobs appropriated Zamora's

deducted wages for his own personal use. Zamora alleges that Jacobs "willfully converted money

owed to Zamora for his . . . heath insurance premiums . . . for [Jacobs's] own personal benefit."

(Complaint, ¶ 15).

## Discussion

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain, *inter alia*, "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007) (*citing* Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.929 (2007)), the Seventh Circuit

noted that the Supreme Court

> has interpreted that language [of Rule 8] to impose two easy-to-clear
> hurdles. First, the complaint must describe the claim in sufficient
> detail to give the defendant "fair notice of what the ... claim is and the
> grounds upon which it rests." ... Second, its allegations must plausibly
> suggest that the plaintiff has a right to relief, raising that possibility
> above a "speculative level"; if they do not, the plaintiff pleads itself
> out of court.

While the complaint need not contain detailed factual allegations, "a plaintiff's obligation

to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic, 127 S.Ct.

at 1959. The plaintiff must plead "enough facts to state a claim for relief that is plausible on its

face." Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 618 (7th Cir. 2007) (*quoting* Bell

Atlantic). The Seventh Circuit advises, however, that Bell Atlantic did not "signal[] an end to notice

pleading in federal courts." Doss v. Clearwater Title Co., 551 F.3d 634, 639 (7th Cir. 2008) (*citing*

Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)).

In order to "enter the realm of plausible liability," the allegations must cross two lines - the

line "between the conclusory and the factual" and the line "between the factually neutral and the

-8-

factually suggestive." Bell Atlantic, 127 S.Ct. at 1966 n.5. It may be that the complaint comes close to stating a claim but needs "factual enhancement" to "cross the line between possibility and plausibility of entitlement to relief." Id. at 1959; see also Airborne Beepers & Video, Inc. v. AT & T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled to under Rule 8.").

The Seventh Circuit has issued more than two dozen opinions discussing Bell Atlantic. See In re Irmen, 379 B.R. 299, 308-09 (Bankr. N.D. Ill. 2007) (collecting and summarizing cases). The Court recently observed that, "[t]he task of applying Bell Atlantic to the different types of cases that come before us continues. In each context, we must determine what allegations are necessary to show that recovery is 'plausible.'" Tamayo v. Blagojevich, 526 F.3d 1074, 1083 (7th Cir. 2008). The context here is a nondischargeability complaint based, in part, on alleged fraud.

Where fraud is alleged, a more rigorous pleading standard comes into play. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Under this standard, a plaintiff must state the "'who, what, when, and where' of the alleged fraud." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir.1992).

Rule 9(b)'s particularity requirement is to be understood in conjunction with Rule 8(a)'s "short and plain statement" notice-pleading requirement. In re Barr, 207 B.R. 168, 172 (Bankr. N.D. Ill. 1997). Consequently, the who, what, when, and where aspects of the fraud need not be related with exact details in the complaint as a journalist would hope to relate them to the general public. Rather, the federal pleader alleging fraud "need only set forth the basic outline of the scheme, who

-9-

made what misrepresentation and the general time and place of such misrepresentations," in order to adequately alert the defendant of the purported fraud he is defending against. Caliber Partners, Ltd. v. Affeld, 583 F.Supp. 1308, 1311 (N.D. Ill. 1984)

The particularity requirement of Rule 9(b) applies equally to all claims which are based upon an underlying fraud, including all three aspects of §523(a)(2)(A) (false pretenses, false representations, and actual fraud), In re Lane, 937 F.2d 694, 698-99 (1st Cir.1991), as well as complaints under §523(a)(4) concerning fraud in a fiduciary capacity, regardless whether the averments pertain to a "cause of action" for fraud. See In re Volpert, 175 B.R. 247, 260 (Bankr. N.D. Ill.1994). While the circumstances of the fraud must be alleged with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

**Zamora's Section 523(a)(2)(A) Claim**

Section 523(a)(2)(A) of the Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  Although somewhat unclear because of a failure to plead in separate counts, Zamora is seeking to have the portion of his debt relating to his unpaid services excepted from discharge under section 523(a)(2)(A). (See Complaint, ¶¶ 11-14).

Generally, in order to except from discharge a debt arising through false pretense or false representations, the plaintiff must establish that the debtor made a false representation, knowing it to be false (or with reckless disregard for its truth), with intent to deceive, on which the plaintiff justifiably relied. Citibank (S. Dakota), N.A. v. Michel, 220 B.R. 603, 605 (N.D. Ill. 1998); In re Basel-Johnson, 366 B.R. 831, 845 (Bankr. N.D. Ill. 2007); In re Brzakala, 305 B.R. 705, 710 (Bankr.

-10-

N.D. Ill. 2004). The Seventh Circuit has held that while most frauds involve misrepresentations, it is possible to allege an "actual fraud" under §523(a)(2)(A) that does not involve a misrepresentation. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). Moreover, Illinois law holds corporate officers "personally liable for their own fraudulent conduct." In re Paul, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001) (*citation omitted*).

Here, Zamora has alleged that Jacobs made false representations to him about his pay, *i.e.* that Jacobs would make good on the NSF checks, which he relied on to continue rendering services. Zamora has not alleged that the mere giving of the NSF checks amounts to a false representation. *See* In re Scarlata, 979 F.2d 521, 525 (7th Cir. 1993) (concluding that the mere tender of a bad check does not amount to a false pretense or representation for purposes of section 523(a)(2)(A)). Rather, Zamora alleges that Jacobs knew there were insufficient funds in the account to cover the paychecks, and when approached by Zamora, Jacobs expressed to him that he would make good on the checks, which Zamora claims Jacobs had no intention of ever doing. Zamora further alleges that he was induced to continue working without being paid by Jacobs's repeated false promises to give him access to his vested profit-sharing plan benefits. These additional circumstances surrounding the NSF checks bring the allegations within the realm of a section 523(a)(2) misrepresentation. *See* In re Sanchez, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002); Brzakala, 305 B.R. at 710. Moreover, Zamora alleges that Jacobs's promises concerning the checks and access to the funds were deceitful when made, because Jacobs knew he would not make good on the checks and Jacobs knew he had already taken most of the plan funds. *See* In re Iaquinta, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989).

Jacobs complains that the time, place, or the contents of the false representations were not alleged with sufficient particularity. The court disagrees. Granted, Zamora does not supply exact

-11-

dates or locations or a word for word recitation of the representation, but such detail is unnecessary. Zamora sets forth a time frame when the representations were made, *i.e.*, the months leading to the closing of the business in early August of 2005. The representations were made by Jacobs in the context of Zamora's employment and their content is adequately spelled out. The allegations are particular enough to adequately place Jacobs on notice of the purported fraud he needs to defend against.

The court concludes that Zamora's allegations are sufficiently particular and plausibly suggest a right to relief under 11 U.S.C. §523(a)(2)(A).

**Zamora's Section 523(a)(4) Claim**

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Again, although somewhat unclear because of a failure to plead in separate counts, Zamora is seeking to have the portion of his debt relating to the funds in the profit-sharing account excepted from discharge under section 523(a)(4). Zamora's arguments focus on embezzlement.

**Embezzlement**

"Embezzlement" has been defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Matter of Weber, 892 F.2d 534, 538 (7th Cir. 1989) (*quoting* Moore v. United States, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)). To prove embezzlement, the plaintiff must show "that (1) the debtor appropriated funds for his or her own benefit, and (2) the debtor did so with fraudulent intent or deceit." Id.; *see also* In re Brady, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (creditor must prove "that he entrusted his property to the debtor, the debtor appropriated the property for a use other than

that for which it was entrusted, and the circumstances indicate fraud"); In re Bryant, 147 B.R. 507,

512 (Bankr. W.D. Mo. 1992) (elements of embezzlement are: (1) appropriation of funds for the

debtor's benefit by deceit; (2) the deposit of those funds into an account accessible only to the

debtor; (3) the disbursal or use of those funds without explanation.).

A debtor cannot embezzle his own property.  In re Brown, 399 B.R. 44, 47 (Bankr. N.D. Ind.

2008).  Moreover, the subject of the purported embezzlement must qualify as property that can be

embezzled.  See In re Leist, 398 B.R. 595, 603 (Bankr. S.D. Ohio 2008) (holding that debt for

usurpation of corporate business opportunity was not an embezzlement debt because the governing

Ohio law does not recognize a corporate business opportunity as identifiable, tangible personal

property capable of being embezzled).

The fraudulent intent element of embezzlement can be shown by circumstantial evidence.

For example, embezzlement is shown where the debtor had sole access to the creditor's funds, and

despite knowing that the creditor wanted the funds returned, surreptitiously took them for his own

benefit.  See In re Davenport, 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006).

Here, Zamora alleges that Jacobs secretly withdrew funds for his own use from the profit-

sharing plan account in which Zamora had a vested interest.  Moreover, Jacobs was falsely promising

Zamora that he would give him information needed to access his vested benefits.  The promises were

designed to mollify Zamora, who repeatedly voiced his concerns to Jacobs about the pattern of not

being paid his wages in full.

The court, however, is concerned with the last element of embezzlement with regards to the

profit-sharing plan account, i.e., whether Jacobs appropriated property belonging to Zamora.

Zamora's interest in the profit-sharing plan account is likely characterized as a vested claim for

equivalent benefits, as opposed to an ownership interest in the funds themselves. *See* Hickerson v.

Velsicol Chemical Corp., 778 F.2d 365, 372 (7th Cir. 1985) (noting that "[w]hile we agree that [the

participants] have a vested right to a benefit at least equal to the value of their account balances . .

., we do not think that this vested right is equivalent to an "ownership interest" . . . There is nothing

in either [the profit sharing plan at issue in that case] itself or in ERISA and its implementing

regulation which would appear to confer on [the participants] anything equivalent to an ownership

interest; indeed, both suggest that the [participants] have only a right to the value of their accounts.");

*see also*, Salazar v. Sandia Corp., 656 F.2d 578, 580 (10th Cir. 1981) ("The plaintiffs under the Plan

had, and have, a right to retirement benefits but they do not have rights to particular contributions

and never did.").

In Hickerson, the Seventh Circuit carefully examined the profit-sharing plan agreement

involved in that case to determine if any of its provisions gave the participants an ownership interest

in the plan assets. The Court concluded that "while the trust documents are consistent with the

proposition that the [participants] acquired a sort of vested interest in the *trust* as of the time of

conversion [from a defined contribution to a defined benefit pension plan] . . . they do not suggest

that the [participants] had an interest in the *assets* of the trust fund." Hickerson, 778 F.2d at 373-74

(emphasis in original).

Zamora's motion papers do not address the legal question of whether by withdrawing funds

from the profit-sharing plan account, Jacobs appropriated Zamora's property. Likewise, Zamora

does not address whether the type of interest Zamora had in the plan funds qualifies as "property

that can be embezzled." Answering the property element question is also impeded by Zamora's

failure to include the plan agreement. Perhaps the plan agreement provides for some type of

-14-

ownership right. Without additional convincing legal support and/or factual enhancement, the court

is not prepared to conclude that Zamora has pleaded a plausible claim for a nondischargeable debt

for embezzlement under section 523(a)(4). However, there are multiple facets of a section 523(a)(4)

claim and if Zamora has successfully pleaded a 523(a)(4) claim under one of them, the court need

not decide the embezzlement issue, at least at the pleading stage.

**Fraud or Defalcation While Acting While Acting in a Fiduciary Capacity**

Zamora can also have his debt excepted from discharge under 523(a)(4) if he shows that a

fiduciary relationship existed between him and Jacobs and that Jacobs committed fraud or

defalcation in the course of that fiduciary relationship. Whether a relationship qualifies as a section

523(a)(4) fiduciary relationship is a question of federal law. In re Frain, 230 F.3d 1014, 1017 (7th

Cir. 2000). A fiduciary relationship may arise in the context of "trusts in a formal sense," In re

Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994), or from a statute or ordinance which "set[s] forth

real attributes creating a trust-like relation." In re McCarthy, 350 B.R. 820, 834 (Bankr. N.D. Ind.

2006) (citing In re McGee, 353 F.3d 537, 541-44 (7th Cir. 2003)). Not all statutes which call for the

creation of a trust, however, will create a fiduciary relationship within the meaning of section

523(a)(4). Statutes enacted solely to assist a governmental unit to collect its debts by mandating the

establishment of a trust might be viewed as creating nothing more than a contractual relation. See

Marchiando, 13 F.3d at 1116-17.

In Marchiando, the Court held that a statute designed to assist the state government in

recovering lottery ticket sales proceeds did not give rise to a fiduciary relationship between the state

and the ticket seller. Id. Although the statute called for a trust, the relationship between the state

and the ticket agent lacked a sufficient fiduciary character for purposes of section 523(a)(4). In that

-15-

regard, the Court observed that "[t]he convenience-store keeper who commingles the proceeds of her lottery ticket sales with her other receipts is at a considerable remove from the lawyer who converts money in his clients' escrow accounts or the bank trust department that invests someone's retirement fund recklessly." Id.

A fiduciary relationship exists in situations which "seem[] to call for the imposition of the same high standard" of loyalty and care as a formal trust. Id at 1115. These situations involve a fiduciary relation in existence prior to the debtor's wrong and are "characterized by disparities in the knowledge or economic status of the participants, the fiduciary having the superior status and/or knowledge to the defrauded creditor victim." McGee, 353 F.3d at 540.

The existence of disparate status or knowledge, however, is not an indispensable requisite of a fiduciary relationship. Id. at 541. For example, a "plutocrat who puts an investment account of $500,000 at the disposal of a recent high-school graduate for the latter's discretionary financial management" has created a fiduciary relationship, even if not a formal trust and even though the teenage fiduciary has less knowledge and is of a lower economic status than the plutocrat. Id. If the teenager gambles the plutocrat's money away, the debt is nondischargeable under § 523(a)(4). Id.

The ordinance at issue in McGee was not, like the lottery statute in Marchiando, designed to collect government debts. Rather, the ordinance in McGee was enacted to protect residential tenants  by charging landlords with duties with respect to their tenants' security deposits. The dictates of that ordinance created attributes or devices which are recognizable as hallmarks of a trust. For example, the landlord was required to deposit the tenant's funds into segregated, insured accounts and was expressly prohibited from commingling the funds with other assets. The "[s]egregation of funds, management by financial intermediaries, and recognition that the entity in

-16-

control over the assets has at most 'bare' legal title to them, are hallmarks of a trust." Id. at 540-41.

Further, these "formal separation and ownership rules" dictated by the ordinance are components of

an economic relation amounting to a fiduciary relationship, regardless of the absence of disparity in

knowledge or status between the landlord and tenant. Id.

If the requisite fiduciary relationship is found to exist under a disparate knowledge/status

approach or economic relation approach, and the fiduciary impermissibly takes and spends the

subject money, he has committed an act of defalcation. See Id. at 539 ("There can be no doubt that,

if McGee was the tenants' fiduciary, withdrawal and spending the money during the eviction

litigation was an act of defalcation."); see also Meyer v. Rigdon, 36 F.3d 1375, 1383-85 (7th Cir.

1994).

The trust involved in this matter is one created pursuant to ERISA, which was enacted to

protect employee benefits. Huppeler v. Oscar Meyer Foods Corp., 32 F.3d 245, 246 (7th Cir. 1994)

("The Supreme Court has . . . noted that the primary motivating purpose of ERISA was to ensure that

'if a worker has been promised a defined pension benefit upon retirement - and if he has fulfilled

whatever conditions are required to obtain a vested benefit - he actually will receive it.'") (quoting

Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64

L.Ed.2d 354 (1980)).

In major respects, ERISA dictates bear hallmarks of a trust. Indeed, the Supreme Court has

observed that the common law of trusts governs the interpretation of many aspects of ERISA. See

Varity Corp. v. Howe, 516 U.S. 489, 497, 116 S.Ct. 1065, 1066, 134 L.Ed.2d 130 (1996); Firestone

Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989)

("ERISA abounds with the language and terminology of trust law."); Mathews v. Sears Pension Plan,

-17-

144 F.3d 461, 465 (7th Cir. 1998) ("[W]hen fiduciary aspects of a plan are in issue, the relevant

principles are those of the law of trusts rather than the law of contracts.").

ERISA mandates that "'the assets of a plan shall never inure to the benefit of any employer

and shall be held for the exclusive purposes of providing benefits to participants in the plan and their

beneficiaries and defraying reasonable expenses of administering the plan.'" Hecker, 556 F.3d at

579 (quoting 29 U.S.C. § 1104(a)(1)); 3 RIA Pension Coordinator, ¶ 23,123, p. 23,110 (updated

through 2008) ("Under the terms of the trust instrument it must be impossible for any part of the trust

principal or income to be used for purposes other than for the exclusive benefit of the employees or

their beneficiaries unless all liabilities under the trust with regard to the employees and their

beneficiaries have previously been satisfied.  The trust must be established for the purpose of

distribution to employees or their beneficiaries the assets and income accumulated by the trust in

accordance with the requirements of the plan.").

The employee participants are equivalent to beneficiaries of the trust. See Firestone Tire, 489

U.S. at 110, 109 S.Ct. at 954.  The law of trusts generally provides that a trustee has bare legal title

to the trust property, while the beneficiary possesses an equitable interest in the trust. See G. Bogert

& G. Bogert, Law of Trusts and Trustees § 146 (2d rev. ed. 1980); McGee, 353 F.3d at 541.

"A profit sharing plan is a type of defined contribution plan that gives employees a share in

the profits of the company."  2 RIA Pension Coordinator, ¶ 1,712, p. 1,705 (2008).  Defined

contribution plans are required to provide for the establishment of separate accounts for each

employee, which can be accomplished via a bookkeeping allocation. See Hughes Aircraft Co. v.

Jacobson, 525 U.S. 432, 439, 119 S.Ct. 755, 761, 142 L.Ed.2d 881 (1999); Hickerson, 778 F.2d at

368 (describing a profit-sharing plan whose assets were held in trust in a common corpus with each

-18-

participant's contributions being separately booked); 2 RIA Pension Coordinator, ¶ 1,712, p. 1,705 and ¶ 1,901, p. 1,901 (2008).

The profit-sharing plan agreement provides for when an employee's accrued beneficial interest in the trust "vests." Vallone v. CNA Financial Corp., 375 F.3d 623, 632 (7th Cir. 2004). The plan agreement's vesting provisions must meet certain ERISA mandated minimum requirements. 2 RIA Pension Coordinator, ¶ 25,401, p. 25,401 (2008). For example, ERISA mandates that a participant's right to his benefit derived from his own contributions be vested at all times. Id. at ¶¶ 25,408 and 25,410, p. 25,403.

Once vested, the participant has a nonforfeitable right to the benefits. 29 U.S.C. § 1053(a); Vallone, 375 F.3d at 635 n.5 (citing 29 U.S.C. §§ 1002(23)(A) and (19)) ("'Accrued' benefits refer to those normal retirement benefits that an employee has earned at any given time during the course of employment. 'Vested' benefits, on the other hand, refer to those normal retirement benefits to which an employee has a "nonforfeitable" claim; in other words, those accrued benefits he is entitled to keep."); see also Huppeler, 32 F.3d at 246. Vesting does not equate with an immediate right to payment, however. The distribution of the vested benefits to the employee is covered by the plan, as prescribed by ERISA. As noted earlier, the participant with a vested interest may not have an ownership interest in the plan funds themselves prior to distribution, but he has an interest in the trust and a nonforfeitable claim to the benefits. Hickerson, 778 F.2d at 372.

Persons with control and authority over the plan, such as the trustee, are considered fiduciaries of the plan and the participants. 29 U.S.C. § 1002(21)(A) (a person is an ERISA fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition

-19-

of its assets. . .”). ERISA imposes common law trust duties on ERISA fiduciaries. <u>Central States,
Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,</u> 472 U.S. 559, 569, 105
S.Ct. 2833, 2840 n. 10, 86 L.Ed.2d 447 (1985) (*quoting* S.Rep. No. 93-127, p.29 (1973), U.S. Code.
Cong. & Admin. News 1974, 4639, 4865 (“The fiduciary responsibility section [of ERISA], in
essence, codifies and makes applicable to these fiduciaries certain principles developed in the
evolution of the law of trusts.”). An ERISA trustee is to exercise the trustee powers in accordance
with the “strict standards of trustee conduct” that ERISA demands, “most prominently, a standard
of loyalty and a standard of care.” <u>Central States,</u> at 570.

Sections 1101-14 of ERISA outline the duties that an ERISA fiduciary owes. <u>Hecker,</u> 556
F.3d at 579. ERISA requires a fiduciary to discharge his duties with respect to the plan solely in the
interest of the participants and beneficiaries. 29 U.S.C § 1104(a)(1). While funds are on deposit in
the trust account, the plan trustee is under a strict, fundamental duty to preserve and maintain them.
29 U.S.C. § 1103(c)(1); <u>Central States,</u> 472 U.S. at 571, 105 S.Ct. at 2841. He is forbidden from
transferring or using the funds. 29 U.S.C. § 1106(a)(1)(D). Fiduciaries are barred from dealing with
plan assets in their own interests or for their own accounts. 29 U.S.C. § 1106(b)(1). Fiduciaries
must exercise prudence, diversify investments of the plan, and act in accordance with the plan
documents. 29 U.S.C. § 1104(a)(1). An ERISA fiduciary has a duty to provide complete and
accurate information about benefits to a requesting participant. *See* 29 U.S.C. § 1104; <u>Electro-
Mechanical Corp. v. Ogan,</u> 9 F.3d 445, 451 (6th Cir. 1993).

There are a number of opinions addressing whether being an ERISA fiduciary *ipso facto*
qualifies a bankrupt debtor as a section 523(a)(4) fiduciary. <u>In re Duncan,</u> 331 B.R. 70, 81 (Bankr.
E.D.N.Y. 2005) (collecting cases). As noted by the <u>Duncan</u> court, some courts hold that “ ERISA

-20-

plan fiduciaries are always fiduciaries for purposes of Section 523(a)(4)." Id. at 81 (citing In re Hemmeter, 242 F.3d 1186, 1190 (9th Cir. 2001)). Other courts take a contextual approach, examining the particular conduct complained of in context to determine whether the ERISA fiduciary is a section 523(a)(4) fiduciary. Id.; see, e.g., Hunter v. Philpott, 373 F.3d 873, 875 (8th Cir. 2004) (holding that in determining whether a defendant was obligated as a fiduciary, courts are required to examine the property alleged to be defalcated); In re Bucci, 493 F.3d 635, 642 (6th Cir. 2007), cert. denied Board of Trustees of Ohio Carpenters' Fund ex rel. Ohio Carpenters Pension Fund v. Bucci, 128 S.Ct. 2903, 171 L.Ed.2d 841 (2008) (being an ERISA fiduciary does not necessarily equate with a 523(a)(4) fiduciary; rather, courts should "examine the substance of the alleged fiduciary relationship.").

When an employee participant complains that the plan trustee impermissibly took funds from the plan trust account for his own use, the activity at issue implicates the ERISA fiduciary's duty to preserve and maintain the trust funds on deposit. Once the contributions have made it to the plan account, they are clearly assets of the plan and the ERISA fiduciary trust duties have undoubtedly kicked in. The relation between the plan trustee and the participant has been elevated to something more than one of contract. The ERISA fiduciary in that context cannot successfully argue he is not a section 523(a)(4) fiduciary and thus escape the full consequences of violating the employee participant's vested benefit rights by appropriating the plan trust funds.

In this matter, Zamora alleges that Jacobs, the sole trustee of Northwest Plating's ERISA-covered profit-sharing plan with the responsibility to manage it, secretly took for his own use most of the funds in the trust account in which Zamora had a vested interest. The funds in the account were held in trust so they would be available when Zamora was entitled to a distribution. Until a

distribution, Zamora had a nonforfeitable claim to the benefit. While the funds were in the trust account, Jacobs was prohibited from transferring or using them. The contributions were placed in an account separate from Northwestern Plating's other accounts, and Zamora's interests in the account were supposed to have been separately allocated from the interests of other Northwestern Plating employees.

Even if a fiduciary relationship were not shown by the trust attributes of ERISA, Zamora has pleaded that prior to Jacobs's appropriation of the funds, Zamora, by becoming a participating employee, reposed a considerable amount of confidence in Jacobs to abide by the dictates of ERISA. Granted, Zamora may not have used those exact terms to describe how he viewed Jacobs's position as plan trustee. However, it is apparent from the Complaint that Zamora knew that Jacobs held the key to those profit-sharing funds and expected Jacobs to be a good steward for the funds so that when the time came for Zamora to receive his benefits, they would be there. In summary, under either the disparate knowledge/status approach or the economic relation approach, Zamora has adequately pleaded with sufficient particularity a plausible claim for nondischargeability based on defalcation while acting as a fiduciary.

Before proceeding to discuss section 523(a)(6), the court notes that in his reply, Jacobs argues that Zamora should be made to drop his 523(a)(4) claim because it will be litigated in the context of a separate adversary proceeding brought against Jacobs by Elaine Chao, Secretary of the Department of Labor. Jacobs urges that "[b]y having to defend two adversary proceedings based upon the same underlying facts, the parties are wasting judicial resources." Such an argument is misplaced as it relates to a possible consolidation of the two proceedings pursuant to Rule 42(a), not a dismissal of the claim pursuant to Rule 12(b)(6).

-22-

**Zamora's Section 523(a)(6) Claim**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a section 523(a)(6) claim, the plaintiff must "show that (1) the debtor intended to and caused an injury to the plaintiff's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious." In re Basel Van Aswegen, 366 B.R. 850, 869 (Bankr. N.D. Ill. 2007). Although not entirely clear, Zamora argues that all aspects of his debt based on the unpaid wages, conversion of the portion of his wages that should have been used to pay his health insurance premium, and the raiding of the profit-sharing plan account, should be excepted from discharge under section 523(a)(6).

Debts for bodily injury are considered to be in the scope of section 523(a)(6). Section 523(a)(6) debts, however, "are not confined to physical damage or destruction; an injury to intangible personal or property rights is sufficient." 4 COLLIER ON BANKRUPTCY, ¶ 523.12[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev.). There is still a controversy over whether debts for injury solely to a creditor's economic interest are within section 523(a)(6)'s scope. Compare In re Leist, 398 B.R. at 604-05, with In re Livingston, 379 B.R. 711, 719-20 (Bankr. W.D. Mich. 2007).

For purposes of section 523(a)(6), "willful" means intent to cause injury, not simply intentional conduct that results in injury. Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Although the Supreme Court made clear in Geiger that negligently or recklessly inflicted injuries are outside the scope of section 523(a)(6), it has not articulated the state of mind necessary to demonstrate the intent to cause injury. "Post-Geiger decisions have generally

-23-

found that a creditor can demonstrate the requisite intent by showing that either the debtor subjectively intended to injure the creditor or knew the injury was substantially certain to result from his or her act."  Susan V. Kelley, GINSBERG & MARTIN ON BANKRUPTCY § 11.06[1] (5th ed. 2008) (*citing among others* In re Markovitz, 190 F.3d 455 (6th Cir. 1999); State of Texas v. Walker, 142 F.3d 813 (5th Cir. 1998); In re Miller, 156 F.3d 598 (5th Cir. 1998); In re Su, 259 B.R. 909 (9th Cir BAP 2001); In re Scarpello, 272 B.R. 691 (Bankr. N.D. Ill. 2002)).

An action is considered "malicious" if it is taken "in conscious disregard of one's duties without just cause or excuse." In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994) (*citation omitted*). "The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) done without just cause and excuse." Basel-Johnson, 366 B.R. at 850 (*citing* Paul, 266 B.R. at 696).

In this matter, the Complaint contains allegations plausibly suggesting a debt for willful and malicious injury at least with respect to the conversion of the portion of Zamora's wages to pay premiums for then nonexistent health insurance, and the interference with Zamora's vested nonforfeitable claim to the profit-sharing plan funds.  Zamora does more than allege that Jacobs intentionally took the wages and funds from the plan account.  He alleges that Jacobs intended to and did injure Zamora by his conduct. (*See, e.g.*, Complaint, ¶ 12).  His allegations suggest more than a non-tortuous injury caused by a mere contract breach. *Compare* In re Salvino, 373 B.R. 578, 591 (Bankr. N.D. Ill. 2007), *aff'd* Wish Acquisition LLC v. Salvino, 2008 WL 182241 (N.D. Ill. Jan. 18, 2008).  Finally, Zamora has sufficiently alleged that the intentional conduct that caused him injury was wrongful and in conscious disregard of Jacobs's duties.  The court will leave for another day the issue of whether the injury to Zamora's economic interests caused by not being paid in full

for services performed in reliance on Jacobs's misrepresentations is within the scope of section

523(a)(6).

### Zamora's Section 727(a)(2) Claim

As noted, the Complaint includes new factual allegations about Jacobs's false testimony at

the Citation Proceeding concerning the disposition of the funds in the profit-sharing plan account.

Zamora also adds new paragraph 20 citing to section 727(a)(2) based on the testimony, complaining

that Jacobs concealed assets and prevented him from recovering on his judgment debt.  Jacobs reads

the new paragraph as a prayer for denial of discharge based on concealment of assets, which should

be dismissed because it was added to the Complaint after the expiration of the deadline to object to

discharge.  The court need not reach the timeliness issue, because even if the section 727(a)(2) claim

were timely filed, Zamora has not stated a plausible claim for right to relief under section 727(a)(2).

Section 727(a)(2) provides, in part,

> (a)  The court shall grant the debtor a discharge, unless -
>
> (2) the debtor, with intent to hinder, delay, or defraud a
> creditor or an officer of the estate charged with custody of property
> under this title, has transferred, removed, destroyed, mutilated, or
> concealed, or has permitted to be transferred, removed, destroyed,
> mutilated, or concealed -
>
> (A) property of the debtor, within one year before the date of
> the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the
> petition.

11 U.S.C. § 727(a)(2).

When examined closely, new paragraph 20 asserts a claim that Zamora's particular debt be

excepted from discharge on section 727 grounds.  Zamora states that "this debt," *i.e.*, the debt Jacobs

-25-

owes Zamora, "not be discharged," and prays that the "Court deny [Jacobs] a discharge *with respect to Creditor . . . Zamora.*" (Complaint, p. 6) (emphasis added). The elements of objection to discharge and dischargeability determinations are distinct. In re Magno, 216 B.R. 34, 42 (9th Cir. BAP 1997). Unlike an action under section 727, a section 523 action seeks to vindicate the plaintiff's particular debt. *See* Id. at 41-42 (*citing* In re Harrison, 71 B.R. 457, 459 (Bankr. D.Minn. 1987)).

Moreover, Zamora contends that Jacobs concealed the disposition of the funds in the profit-sharing account within one year of the filing of the bankruptcy case. Those funds, however, were not property of the debtor (or of his wholly-owned corporation Northwestern Plating) within the meaning of section 727(a)(2). A fraudulent concealment is not enough to merit denial of discharge under section 727(a)(2). It must be shown that the debtor's property was fraudulently concealed, the point being that the concealment of the debtor's property prevents it from being included in the estate for distribution to all of the estate's creditors, thereby frustrating a major purpose of the Bankruptcy Code. *See* In re Lippow, 92 F.2d 619, 621 (7th Cir. 1937); In re Bailey, 145 B.R. 919, 926 (Bankr. N.D. Ill. 1992). A debtor concealing someone else's property may prevent an individual creditor from recovering fully on a particular debt, but does not frustrate the general distributive process, and is therefore, not a basis for refusal of the discharge. Id.

For these reasons, the court concludes that the Complaint does not suggest a plausible claim for denial of discharge because of fraudulent concealment of the debtor's property within one year prior to the petition date.

**Conclusion**

For all of the foregoing reasons, the Defendant's Motion to Dismiss Plaintiff's Second

Amended Complaint to Deny Discharge Under 11 U.S.C. § 523(a), and Under 11 U.S.C. § 727(a)(2)

will be granted in part and denied in part. The section 523(a)(2), (a)(4), and (a)(6) claims withstand

dismissal. The section 727(a) claim will be dismissed.


Dated:   APR 0 9 2009                        ENTERED:

                                             SUSAN PIERSON SONDERBY
                                             United States Bankruptcy Judge

-27-